COMMONWEALTH *vs.* PEACE CHOU.

Middlesex. October 6, 2000. - January 22, 2001.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, & SOSMAN, JJ.

*Idle and Disorderly Person. Statute,* Construction. *Threatening. Constitutional Law,* Freedom of speech and press, Equal protection of laws, Equal Rights Amendment. *Words,* "Disorderly," "Accosting," "Annoying."

Discussion of the word "disorderly" as it has been construed in the context of the offense of being "idle and disorderly" under G. L. c. 272, § 53. [231-232]

This court concluded that, for purposes of the offense of accosting or annoying a person of the opposite sex with offensive or disorderly acts or language in violation of G. L. c. 272, § 53, the word "disorderly" means fighting or threatening, violent or tumultuous behavior, or creating a hazardous or physically offensive condition for no legitimate purpose of the actor, whether the resulting harm is suffered in public by the public or in private by an individual. [232-233]

The posting in a high school of a flyer containing sexually explicit and aggressive language directed at a female student was threatening, where it created a reasonable fear of harm in the student, and was therefore "disorderly" within the meaning of the provision of G. L. c. 272, § 53, that makes criminal accosting or annoying a person of the opposite sex with offensive and disorderly acts or language. [233-235]

Speech that amounted to a criminal threat was not protected under the First Amendment to the United States Constitution. [235-237]

No substantial risk of a miscarriage of justice arose from the conviction of a criminal defendant under the provisions of G. L. c. 272, § 53, which arguably are underinclusive because offensive and disorderly acts or language are not punished if the perpetrator and victim are the same gender, where the statute, if a facial challenge had properly been raised, could be read to reach the conduct of both men and women against either men or women, and where the defendant would not, in any event, have benefited from such a ruling. [237-239]

COMPLAINT received and sworn to in the Framingham Division of the District Court Department on June 9, 1998.

The case was heard by *Paul F. Healy, Jr.,* J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Mark W. Helwig* for the defendant.

*Jennifer C. Roman,* Assistant District Attorney (*Margaret A. Peterson,* Assistant District Attorney, with her) for the Commonwealth.

SPINA, J. The defendant, Peace Chou, was convicted of accosting or annoying a person of the opposite sex with offensive and disorderly acts or language. G. L. c. 272, § 53.[1] On appeal he claims that the judge improperly denied his motion for a required finding of not guilty, arguing that (1) his language and conduct were not "disorderly"; (2) as applied, the annoying or accosting provision of § 53 criminalizes his speech in violation of his rights under the First Amendment to the United States Constitution and art. 16 of the Massachusetts Declaration of Rights, as amended by art. 77 of the Amendments to the Massachusetts Constitution; and (3) as applied, the provision violates the equal protection clause of the Fourteenth Amendment to the United States Constitution and art. 1 of the Massachusetts Declaration of Rights because it punishes only those who accost or annoy persons of the opposite sex. We transferred the case to this court on our own motion and affirm the judgment of conviction.

1. *Facts.* In October, 1997, the defendant, then eighteen years old, produced a number of "missing person" flyers identifying and describing a young woman he had dated for approximately three weeks. The young woman, a high school student, "had broken up" with the defendant some weeks before. Determined to "get back" at her, the defendant sneaked into her school one night and hung several flyers at various locations.

The word "MISSING" is printed in large type across the top of the flyer beneath which is the young woman's name; a large photograph of her fills the right-hand corner of the flyer. Her "Race" is listed as "White Slut." The description of the victim includes the following statements: "Will respond to: 'Cum to daddy, Urin;' Favorite Song: 'Put it in the mouth'; Favorite

---

[1]General Laws c. 272, § 53, states: "Common night walkers, common street walkers, both male and female, common railers and brawlers, *persons who with offensive and disorderly acts or language accost or annoy persons of the opposite sex,* lewd, wanton and lascivious persons in speech or behavior, idle and disorderly persons, disturbers of the peace, keepers of noisy and disorderly houses, and persons guilty of indecent exposure may be punished by imprisonment in a jail or house of correction for not more than six months, or by a fine of not more than two hundred dollars, or by both such fine and imprisonment" (emphasis added).

drink: protein rich semen; . . . Most recent employer: BJs Wholesale Club; . . . Other distinguishing characteristics: Has a nipple ring; Extremely loose; Has trouble sitting down because of numerous penetrations; Ass itches & bleeds violently; . . . Gets passed around (sometimes for free) like you wouldn't believe." The victim's guidance counsellor was so concerned that the police were contacted when the flyer was brought to her attention.

The defendant did not contest the Commonwealth's evidence that he made or hung the flyers. The victim testified that she was very upset by the language on the flyer, and felt violated by its display at her school. She was also afraid, as the defendant had threatened to hit her at least once during their brief relationship and he had telephoned her in anger about the breakup a few weeks before he posted the flyers. After the incident the victim suffered from nightmares in which the defendant chased her with a gun.

2. *Disorderly acts or language.* The defendant argues that neither his acts nor his language was disorderly within the meaning of the statute.[2]

Section 53 can be traced to colonial and provincial acts. *Commonwealth* v. *Diamond*, 248 Mass. 511, 514-517 (1924). The provision as to accosting or annoying was added to Rev. L. c. 212, § 46 (1902), when it was rewritten in 1914. St. 1914, c. 743. See *Commonwealth* v. *Lombard*, 321 Mass. 294, 295 (1947). The *Lombard* case is the only decision that has construed this provision. In that case the court held that "offensive" and "disorderly" were separate and distinct elements of the crime, both of which had to be pleaded and proved, but the case did not provide an opportunity to define either term. *Id.* at 296. In *Alegata* v. *Commonwealth*, 353 Mass. 287 (1967), we engrafted the Model Penal Code definition of "disorderly" onto

---

[2]We note at the outset that G. L. c. 272, § 53, has been saved, although sometimes just barely, by several limiting constructions and we have repeatedly commented that the statute is archaic and in need of legislative scrutiny. See *Commonwealth* v. *Feigenbaum*, 404 Mass. 471, 474 (1989) (construction of term "idle and disorderly" "has had a tortured history"); *Commonwealth* v. *A Juvenile*, 368 Mass. 580, 598 (1975) ("we have attempted to save by judicial construction the bare bones of § 53"). See also *Commonwealth* v. *Blavackas*, 11 Mass. App. Ct. 746, 751 (1981) ("The section . . . has been limited and indeed altered, by judicial decisions . . . [and] obviously is badly in need of careful legislative attention and comprehensive revision and rearranging").

the separate § 53 offense of being an idle and disorderly person.[3] *Id.* at 304. Model Penal Code § 250.2 (Proposed Official Draft 1962). In *Commonwealth* v. *A Juvenile*, 368 Mass. 580, 581, 599 (1975), again construing the disorderly person provision, we limited the adopted portion of the Model Penal Code definition to § 250.2(1)(a) and (c), because § 250.2(1)(b) suffered from the same constitutional infirmities as similar disorderly conduct statutes held to be facially overbroad in the Supreme Court's then recent First Amendment decisions. *Id.* at 593. By virtue of the prefatory language of the definition of "disorderly" in the Model Penal Code, a prosecution under the disorderly person provision also requires that the conduct have a public element or impact.[4] *Id.* at 596. The resulting definition of "disorderly" for purposes of the disorderly person provision of § 53 includes only those individuals who, "with purpose to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof . . . : (a) engage[] in fighting or threatening, or in violent or tumultuous behavior; or . . . (c) create[] a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor." See *Commonwealth* v. *Sholley*, 432 Mass. 721, 727 n.7 (2000); *Commonwealth* v. *Richards*, 369 Mass. 443, 446 & n.2 (1976).

*Commonwealth* v. *A Juvenile, supra,* did not present the question, nor did we discuss, whether the word "disorderly" should have the same meaning in both the disorderly person and the accosting and annoying provisions of § 53. Where, as here, the

---

[3]Model Penal Code § 250.2: "(1) Disorderly Conduct. *Offense Defined.* A person is guilty of disorderly conduct if, with purpose to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he:

"(a) engages in fighting or threatening, or in violent or tumultuous behavior; or

"(b) makes unreasonable noise or offensively coarse utterance, gesture or display, or addresses abusive language to any person present; or

"(c) creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor.

" 'Public' means affecting or likely to affect persons in a place to which the public or a substantial group has access . . . ."

[4]"[W]ith purpose to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof." Model Penal Code § 250.2 (Proposed Official Draft 1962). This public element has since been engrafted on and rigidly applied to the § 53 offense, "lewd, wanton and lascivious persons in speech or behavior." See *Commonwealth* v. *Roy*, 420 Mass. 1, 3 (1995); *Commonwealth* v. *Sefranka*, 382 Mass. 108, 111 (1980); *Commonwealth* v. *Templeman*, 376 Mass. 533, 537 (1978).

various and sundry crimes under a single statute are as different as they are similar, we look to the same source to construe the same word but tailor the construction to fit the particular crime charged, ever mindful of ordinary usage and legislative purpose. See *Hanlon* v. *Rollins*, 286 Mass. 444, 447 (1934). Cf. *Arlington Hous. Auth.* v. *Secretary of Communities & Dev.*, 409 Mass. 354, 359 (1991) (concluding that, while same word may have same meaning, scope of its operation may differ in different parts of statute).

Whereas disorderly conduct under the disorderly person provision must have a public impact, the crime of accosting or annoying a person of the opposite sex evinces a legislative intent to criminalize offensive and disorderly conduct or language that has a personal and private, rather than a necessarily public, impact. This reading is supported by *Commonwealth* v. *Lombard*, *supra* at 295-296, in which we held that a 1943 amendment to the provision striking the phrase "in public places" indicated a clear legislative intent that it apply even to "[an] offence . . . committed . . . within the walls of a private residence." Cf. G. L. c. 269, § 14A ("Whoever telephones another person . . . for the sole purpose of harassing, annoying or molesting such person or his family . . ."). A wholesale engrafting of the limiting prefatory language of the Model Penal Code's definition of "disorderly" onto the accosting or annoying provision would not square with either the holding in the *Lombard* decision or the express elements of the crime of accosting or annoying. We therefore hold that, for purposes of this § 53 offense, "disorderly" acts or language are those that involve fighting or threatening, violent or tumultuous behavior, or that create a hazardous or physically offensive condition for no legitimate purpose of the actor, whether the resulting harm is suffered in public by the public or in private by an individual.

Applying our definition, we do not perceive any fighting, or violent or tumultuous behavior, in the flyer's unaltered photograph and sexualized description of the victim, nor in the defendant's conduct in creating or hanging the flyer at the school during the night. See *Commonwealth* v. *Sholley*, *supra* at 729; *Commonwealth* v. *A Juvenile*, *supra* at 597. We also conclude that neither the flyer's content nor the defendant's conduct in creating or hanging the flyer could have been found to create a hazardous or physically offensive condition as our courts have construed those terms. See *Commonwealth* v. *Feigenbaum*, *su-*

*pra* at 475 (blocking tow truck and disregarding police warnings to move "created a hazardous condition"); *Commonwealth v. LePore*, 40 Mass. App. Ct. 543, 548 (1996) (voyeurism "created a physically offensive condition").

This case turns, then, on whether the content of the flyer may be characterized as threatening. Sexually explicit language, when directed at particular individuals in settings in which such communications are inappropriate and likely to cause severe distress, may be inherently threatening. Cf. *Commonwealth v. Robicheau*, 421 Mass. 176, 183 (1995) (offensive speech in context of violating protective order under G. L. c. 209A "placed the victim in reasonable apprehension of imminent serious physical harm [and therefore] is equivalent to the crime of assault"). A sexually explicit poem written by a male prisoner and handed to a female staff member was held to be a threat where the inmate had, prior to the incident, indicated in clear language and behavior that he found her attractive and wanted to see her once he was paroled. *Gomes v. Fair*, 738 F.2d 517, 524, 526-527 (1st Cir. 1984) ("sexual proposition need not ripen into a physical assault before prison officials can take steps"). We recognize the heightened deference granted to prison administrators on matters of prison security and do not suggest that the standards for evaluating sexually charged language in such a case be extended beyond the prison walls. However, we are persuaded that that court's conclusions regarding the reasonableness of acknowledging and responding to threats inherent in certain sexually explicit communications are consistent with decisions by other courts confronted with similar materials in nonprison contexts. See *Commonwealth v. Miller*, 385 Mass. 521, 525, 526 (1982) (threat to circulate photograph of semi-clad young woman and expose information about her sexual activities constituted "malicious threat" to injure young woman's person under G. L. c. 265, § 25).

Moreover, language properly may be understood and treated as a threat even in the absence of an explicit statement of an intention to harm the victim as long as circumstances support the victim's fearful or apprehensive response. See *United States v. Fulmer*, 108 F.3d 1486, 1492 (1st Cir. 1997); *Gomes v. Fair*, *supra*; *Planned Parenthood of the Columbia/Willamette, Inc. v. American Coalition of Life Activists*, 23 F. Supp. 2d 1182, 1194 (D. Or. 1998) (whether "statement [is] innocent or threatening must be determined from the context in which it was made").

Justice Marshall wrote that it is the intent to threaten rather than the intent to carry out the threat that is dispositive. *Rogers* v. *United States*, 422 U.S. 35, 46-47 (1975) (Marshall, J., concurring). See *United States* v. *Kelner*, 534 F.2d 1020, 1025 (2d Cir.), cert. denied, 429 U.S. 1022 (1976).

We are persuaded that sexually explicit and aggressive language directed at and received[5] by an identified victim may be threatening, notwithstanding the lack of evidence that the threat will be immediately followed by actual violence or the use of physical force. Cf. *Commonwealth* v. *Milo M.*, *ante* 149 (2001); *Commonwealth* v. *Ditsch*, 19 Mass. App. Ct. 1005, 1005 (1985) (absence of immediate or personal ability to carry out threat does not preclude conviction under G. L. c. 275, § 2, of having made "threats of bodily harm" where defendant was behind bars when he mailed threat to victim). Here, the sexually charged language appeared in a poster identifying the victim as "missing." Objectively, a reasonable person could, as the victim and her guidance counsellor did, legitimately fear that the flyer was a veiled threat that the named victim would indeed become a "missing person" or that some sexually violent harm would befall her, particularly where the defendant had threatened to hit her during their brief relationship, and telephoned her to express his anger about their breakup. In addition, the fact that the defendant sneaked into her school at night in order to post the flyers could have greatly contributed to the victim's fear by eroding her reasonable expectation of safety at school. The evidence was sufficient to support a finding that the defendant's language was threatening and therefore disorderly under the accosting or annoying provision of § 53.

3. *First Amendment.* The defendant next argues that our decision in *Commonwealth* v. *A Juvenile*, *supra*, compels the conclusion that his language cannot be the basis of a conviction under the accosting or annoying provision of § 53 without violating the First Amendment. We disagree.

The defendant in *Commonwealth* v. *A Juvenile*, *supra* at 599, challenged the disorderly person provision of § 53 as unconstitutionally overbroad and vague, and in that context we construed

---

[5]Although there was no evidence to suggest that the defendant handed the flyer directly to the victim or that he posted it on her personal locker, it was reasonable for the fact finder to infer that the defendant posted the flyer at the victim's school to ensure that she would see it or that its contents would be otherwise communicated to her.

the provision to reach only conduct that involved "no lawful exercise of a First Amendment right." In our view at that time, Model Penal Code § 250.2(1)(b), which permitted charges to be brought against any individual for the use of offensive and abusive language, was "susceptible of application to protected expression" and, therefore, facially overbroad. *Id.* at 592, citing *Gooding* v. *Wilson*, 405 U.S. 518, 523 (1972). As noted above, we therefore limited the Model Penal Code definition of disorderly, engrafted onto the disorderly person provision by *Alegata* v. *Commonwealth*, 353 Mass. 287 (1967), to subsections (a) and (c) which, inter alia, include "fighting or threatening." There was, however, no allegation in *Commonwealth* v. *A Juvenile*, *supra*, that the defendant had made any threats. Therefore, notwithstanding dicta to the contrary, we clarify today that threats may serve as the basis of a conviction under the accosting or annoying provision of § 53. See *Chaplinsky* v. *New Hampshire*, 315 U.S. 568, 572, 573 (1942).

The regulation of threatening speech has been held not to violate the First Amendment where the speech harasses or is a "true threat." Such speech is unprotected: its purpose is to cause injury rather than to add to, or to comment on, the public discourse. Courts have, for the most part, been able readily to distinguish between those categories of language involving threats and harassment that may be subject to sanctions and those that may not. See, e.g., *Brookline* v. *Goldstein*, 388 Mass. 443, 450 (1983) (government could prosecute individual whose repeated calls and complaints to town officials at their homes constituted actionable harassment because it "infringe[d] on the legitimate rights of other citizens"); *Planned Parenthood of the Columbia/Willamette, Inc.* v. *American Coalition of Life Activists*, *supra* at 1188 (notwithstanding political dimension of expressing views on abortion, veiled threats against abortion providers not entitled to First Amendment protection).

The term "true threat" has been adopted to help distinguish between words that literally threaten but have an expressive purpose such as political hyperbole, and words that are intended to place the target of the threat in fear, whether the threat is veiled or explicit. Compare *Watts* v. *United States*, 394 U.S. 705, 706, 708 (1969) (per curiam) (statement at political rally that, if inducted into Army and made to carry rifle, "the first man I want to get in my sights is L.B.J.," was, given its conditional nature and context in which it was made, political

hyperbole and, therefore, not "true threat" under 18 U.S.C. § 871[a]), with *United States* v. *Fulmer,* 108 F.3d 1486, 1490, 1492 (1st Cir. 1997) (voicemail message to Federal agent that "[t]he silver bullets are coming. . . . Enjoy the intriguing unraveling of what I said to you" was, given defendant's history of threats against the agent, reasonably understood as a "true threat" under 18 U.S.C. § 875[c]). The defendant's language had no expressive purpose but was, instead, intended to "get back" at the victim by placing her in fear that she might suffer some sexual harm or wind up among the "missing." Because his language was a true threat, it could, consistent with the First Amendment, support a conviction under the accosting and annoying provision of § 53. See *Rogers* v. *United States, supra* at 46-47 (Marshall, J., concurring). Our decision in *Commonwealth* v. *A Juvenile, supra,* does not hold otherwise.

4. *Equal protection.* The defendant next argues that the statute as applied violates the equal protection clause of the Federal Constitution and art. 1 of the Declaration of Rights, as amended by art. 106 of the Amendments to the Massachusetts Constitution, the "equal rights amendment." He claims that the statute is underinclusive because it does not punish offensive and disorderly acts or language that accost or annoy persons of the same sex as the perpetrator. The statute does not apply unless the perpetrator crosses the gender line to reach his or her victim.[6]

The Commonwealth, in turn, argues that the defendant's argument is actually a facial challenge to the statute that should have been made in a pretrial motion to dismiss pursuant to Mass. R. Crim. P. 13 (c), 378 Mass. 871 (1979), rather than in his motion for a required finding of not guilty. But see *Commonwealth* v. *Davie,* 46 Mass. App. Ct. 25, 27 n.6 (1998). We agree.

---

[6]Under the Federal Constitution, gender, unlike race or alienage, is not a suspect class and, therefore, equal protection claims that a classification is impermissibly gender based are subject to "intermediate scrutiny." See *Clark* v. *Jeter,* 486 U.S. 456, 461 (1988). Under the Massachusetts equal rights amendment, however, "classifications on the basis of sex are subject to a degree of constitutional scrutiny 'at least as strict as the scrutiny required by the Fourteenth Amendment for racial classifications.' " *Attorney Gen.* v. *Massachusetts Interscholastic Athletic Ass'n, Inc.,* 378 Mass. 342, 354 (1979), quoting *Commonwealth* v. *King,* 374 Mass. 5, 21 (1977). Such classifications "will be upheld only if a compelling interest justifies the classification and if the impact of the classification is limited as narrowly as possible consistent with its proper purpose." *Lowell* v. *Kowalski,* 380 Mass. 663, 666 (1980).

An "as applied" challenge on the basis of equal protection or the equal rights amendment is a challenge to the unequal enforcement of an otherwise valid statute against a protected class of persons. See *Commonwealth* v. *King*, 374 Mass. 5, 17-22 (1977). Because the statute, by its terms, can be enforced only across gender lines, the defendant's challenge is necessarily to the validity of the statute itself. It is, therefore, a facial challenge that should have been made in a pretrial motion to dismiss. See Mass. R. Crim. P. 13 (c). See also *Commonwealth* v. *Jasmin*, 396 Mass. 653, 655 (1986) ("It may be that, pursuant to rule 13[c], an argument based on the facial invalidity of a criminal statute should be presented by a pretrial motion"); *Lydon* v. *Commonwealth*, 381 Mass. 356, 367, cert. denied, 449 U.S. 1065 (1980) (valid double jeopardy claim "should be dealt with before . . . trial"). The issue has not been preserved for full appellate review, but we consider it under the standard of a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Oakes*, 407 Mass. 92, 94-95 (1990) (failure to raise as applied challenge to statute's constitutionality in motion for required finding of not guilty will be reviewed under substantial risk of miscarriage of justice standard).

If a statute is unconstitutional because of underinclusion, a court may either declare the entire statute void, or extend its coverage to those formerly excluded. See *Califano* v. *Westcott*, 443 U.S. 76, 89 (1979); *Welsh* v. *United States*, 398 U.S. 333, 361 (1970) (Harlan, J., concurring). As to the second alternative, "where a statutory provision is unconstitutional, if it is in its nature separable from the other parts of the statute, so that they may well stand independently of it, and if there is no such connection between the valid and the invalid parts that the Legislature would not be expected to enact the valid part without the other, the statute will be held good, except in that part which is in conflict with the Constitution." *Commonwealth* v. *Petranich*, 183 Mass. 217, 220 (1903). See *United States* v. *Jackson*, 390 U.S. 570, 585 (1968).

Had the defendant succeeded in a facial attack, a point we need not decide, the provision that he claims offends the equal protection clause and the Massachusetts equal rights amendment could have been struck without sacrificing the integrity and purpose of the statute. See G. L. c. 4, § 6, Eleventh ("The provisions of any statute shall be deemed severable . . ."). The surviving portion of the accost or annoy provision of § 53

would permit criminal convictions of "persons who with offensive and disorderly acts or language accost or annoy persons," and thus would preserve the legislative intent to punish both men and women for offenses committed against either men or women. Because the surviving statute would have reached the conduct proved here, the defendant would not have benefited from such a ruling. Moreover, the defendant's conviction may be affirmed without offending due process. He had "fair warning at the time of his conduct that such conduct was . . . criminal" under G. L. c. 272, § 53. *People* v. *Liberta*, 64 N.Y.2d 152, 173 (1984), cert. denied, 471 U.S. 1020 (1985). See, e.g., *Ex parte Tullos*, 541 S.W.2d 167, 170 (Tex. Crim. App. 1976).

*Judgment affirmed.*