Kenton-Walker, Janet, J.
The defendant, Kevin Forts (“Forts”), is charged with one count of making a bomb threat in violation of G.L.c. 269, §14(b). Forts moves the court to dismiss the indictment against him, arguing that the Grand Jury heard insufficient evidence for issuing the indictment. For the following reasons, Forts’ motion to dismiss is DENIED.
BACKGROUND
The following facts are taken from the Grand Juiy minutes and the exhibits presented to the Grand Jury.
Assumption College (the “school”) is a private higher education institution. Approximately two thousand students attend the school and many of the students reside on campus. On September 23,2011, Forts was a student at the school. On that date, sometime between 11:00 a.m. and 11:30 a.m., Professor David Cohen (“Professor Cohen”) forrad a document in a bathroom on the first floor of Founders Hall, a school building consisting classrooms and faculty offices. The top of the document contained the poem titled Invictas, written by William Ernest Henley. After the poem were typed words: “Founders Hall—evacuate at 2:33 p.m.” Professor Cohen gave the document to a department secretary in Founders Hall, who brought it to the attention of Sergeant Don Brickman (“Sergeant Brickman”), a detective sergeant of the school police department.
Sergeant Brickman investigated the matter further and, through interviews with other school staff members, was able to narrow the timeframe when the document was placed in the bathroom to sometime between 7:00 a.m. and 8:15 a.m. Brickman contacted the Worcester Police Department and secured the document as evidence for fingerprint analysis. The officers later learned that the poem Invictas had been quoted by Timothy McVeigh prior to his execution; McVeigh bombed a government building in Oklahoma City, Oklahoma in 1985.
During Sergeant Brickman’s investigation, he learned that Professor Owen Sholes (“Professor Sholes”) had called the school police department concerning documents that had been slid under the door to his faculty office. Other officers of the school police department located similar material tacked on bulletin boards in both Founders Hall and Testa Hall, the school’s science building. These documents were later identified as portions of a manifesto by Anders Behring Breivik (“Breivik”), a Norwegian extremist convicted of killing seventy-seven people in a bombing and shooting attack in July 2011 in Oslo and Utoya Island, Norway.[1] See “Norwegian Mass Killer Gets Maximum Sentence: 21 Years,” N.Y. TIMES, A3 (August 25, 2012).
Because officers interpreted the poem, the accompanying instruction to evacuate Founders Hall at 2:33 p.m., and the portions of Breivik’s manifesto as abomb threat against Founders Hall, the building was evacuated. Authorities waited until 2:50 p.m. to search the building for bombs. No bombs or other suspicious materials were located during the search.
All of the documents found and collected by Sergeant Brickman were turned over to the Crime Scene Unit of the Worcester Police Department for fingerprint testing. Seventeen latent fingerprints were found on the documents. Those prints were compared to prints from the individuals at the school who had discovered the documents. Two of the prints were a match to those individuals.
Forts became a suspect when a Worcester Police detective informed Sergeant Mark Richardson (“Sergeant Richardson”), the lead detective in the school investigation, that they had been alerted by the FBI that Forts had been interviewed by a Norwegian television program. In that video recorded interview, which took place in front of the Massachusetts Trial Court building on Main Street in Worcester, Forts told his interviewer that he was a student at Assumption College and made sympathetic remarks about Breivik.
A subpoena was issued for Forts to provide his fingerprints to the Worcester Police Department, which he did, accompanied by his attorney. Fourteen of the latent fingerprints found on the documents matched those of Forts. Two other fingerprints matched with the people who located the documents. Three fingerprints were not matched to anyone.
*74 The Commonwealth charged Forts with one count of making abomb threat in violation of G.L.c. 269, § 14. Sergeant Brickman and Sergeant Richardson testified to the above facts before the Grand Jury on January 13, 2015. On January 16, 2015, the Grand Jury indicted Forts on the single count.
DISCUSSION
“[A] court reviewing the sufficiency of evidence before a grand jury should not dismiss if the evidence was adequate ‘to establish the level of probable cause required to support an arrest or search.’ ” Commonwealth v. Brown, 55 Mass.App.Ct. 440, 446-47 (2002), quoting Commonwealth v. McCarthy, 385 Mass. 160, 162-63 (1982). Probable cause is “reasonable trustworthy information . . . sufficient to warrant a prudent man in believing that the defendant had committed or was committing an offense.” Commonwealth v. Stevens, 362 Mass. 24, 26 (1972), quoting Beck v. Ohio, 379 U.S. 89, 91 (1964). Where a grand jury receives “no evidence of criminalily on the part of the accused,” however, “fundamental fairness requires that an indictment be dismissed ...” Commonwealth v. Cheremond, 461 Mass. 397, 404 (2012) (emphasis in original).
Forts asserts there was insufficient evidence before the Grand Jury to prove that he threatened Founders Hall or its occupants in the manner required for indictment under G.L.c. 269, §14. Forts does not dispute the facts presented by the Commonwealth, but instead argues that because the documents he left at the school contain no references to specific weapons listed in §14, his conduct may not be interpreted as a threat as a matter of law. The only issue implicated by Forts’ motion to dismiss, therefore, is whether his conduct constituted a “threat” under §14 even though none of his communications contained specific references to the weapons listed in the statute.[2]
The court begins its assessment of the evidence before the Grand Jury by determining what evidence the Commonwealth was required to present to secure a lawful indictment under §14. The language of §14 that is pertinent to this motion provides:
Whoever willfully communicates or causes to be communicated, either directly or indirectly, orally [or] in writing ... a threat. . . that a firearm, rifle, shotgun, machine gun or assault weapon, ... an explosive or incendiary device,... or any other device, substance, or item capable of causing death, serious bodily injury or substantial property damage, will be used at a place or location, or is present or will be present at a place or location, whether or not the same is in fact used or present. . . shall be punished .. .
Securing an indictment under §14 only requires the Commonwealth to present some evidence that a defendant communicated a threat to have present certain weapons “at a place or location.” Commonwealth v. Kerns, 449 Mass. 641, 654 (2007).
Critically, the statute protects places and not people. That is, indictment under §14 does not require the Commonwealth to prove that a defendant’s threat be communicated directly to the defendant’s intended target, or, for that matter, that the threat even have particular targets. Id. This fact becomes important in any analysis of whether a “threat” was made under the statute because it defies traditional conceptualizations of the term “threat,” which usually involves some fear or apprehension on the part of the recipient of the threat. See Commonwealth v. Robicheau, 421 Mass. 176, 183 (1995) (“The elements of threatening a crime include an expression of intention to inflict a crime on another and an ability to do so in circumstances that would justify apprehension on the part of the recipient of the threat”).
The Commonwealth need not present evidence that any individual was placed in fear as a result of a defendant’s threat in order for a grand jury to indict that defendant under §14.[3] Instead, the Commonwealth need only present evidence that a reasonable person would have understood the defendant’s threat as communicative of his or her intent to use or have present one of the weapons listed in the statute in any location. See Kerns, 449 Mass, at 654. Therefore, the court will only consider whether Forts’ conduct could reasonably be interpreted to communicate a threat to use or have present the weapons listed in §14 at Founders Hall. It will not consider whether Forts’ “threats” were made in “circumstances that would justify apprehension on the part of the recipient of the threat.” Robicheau, 421 Mass, at 183.[4]
There can be no doubt that when the document Forts left in the bathroom in Founders Hall is considered in isolation, it does not constitute a threat that a weapon listed in §14 would be used at Founders Hall. The poem, Invictus, contains no references to weapons, and the court will not extend its power of interpretation to nineteenth century poetry by giving the poem a meaning it does not plainly have. The warning following the poem to evacuate Founders Hall at 2:33 p.m. does not transform the document into a written threat under §14 because no weapon listed in the statute is referenced, directly or indirectly, in the warning, and police could not infer that the document’s author intended to bring one of the listed weapons to Founders Hall without more information.[5]
However, by leaving excerpts of the Breivik manifesto under the office door of a faculty member and posted on numerous school bulletin boards, Forts did provide additional information to the recipients of his statements. The court considers the extent to which the content of the manifesto, together with the poem and warning to evacuate Founders Hall, constitutes a threat that one of the weapons listed in § 14 would be used or at least be present at Founders Hall and concludes that it does.
In so concluding, the court notes two highly operative phrases in §14 that make these documents a bona fide threat under the statute when all of the documents are *75 considered together. First, under § 14(b), the threat may be communicated “either directly or indirectly.” That is, a defendant may be indicted under the statute even though his threat is not explicit; indictment is still proper if a grand juiy determines that the recipient of the threat could reasonably infer that the defendant intended to use or have present one of the listed weapons.
Second, with respect to listed weapons, §14(b)(l) lists several different kinds of weapons, but concludes the list with a catch-all phrase: “any other device, substance, or item capable of causing death, serious bodily injury or substantial property damage.” A threat under § 14, therefore, need not contain a specific reference to guns, bombs, chemicals, biological agents, or any other weapon, so long as the recipient of the threat reasonably understands that the individual making the threat intends to use or make present some “device, substance, or item” capable of inflicting serious harm, death, or serious property damage.
The documents Forts left in numerous locations throughout Founders Hall and Testa Hall, while not explicit expressions of his intent to bring a harmful device, substance, or item to the school, could reasonably be interpreted as implicit expressions of his intent to do so. The manifesto, while it contains no specific references to weapons, clearly endorses mass murder:
There are situations in which cruelly is necessary, and refusing to apply necessary cruelty is a betrayal of the people whom you wish to protect. The preferred method is to attack in a violent and deceptive form (shock attack), usually with limited forces (1-2 individuals). Once you decide to strike, it is better to kill too many than not enough... Some innocent will die in our operations as they are simply at the wrong place at the wrong time. Get used to the idea.
[[Image here]]
I’m pretty sure I will pray to God as I’m rushing through my ci1y, guns blazing, with 100 armed system protectors pursuing me with the intention to stop and/or kill.
Grand Jury Exhibit 2.[6] School police officers and Worcester police officers were handed a note that warned readers to evacuate Founders Hall and an excerpt of a manifesto extolling the virtues of violent mass murder “[i]n order to wake up the masses” which was found in the office of a faculty member. Id. They then found copies of the same excerpts on bulletin boards in two school buildings. It was not unreasonable for the officers, after reading these documents, to conclude that Forts intended to inflict harm to the occupants of Founders Hall or, at the very least, the building itself, using a “device, substance, or item” capable of serious harm or death.[7]
The Commonwealth’s presentation to the Grand Juiy contained sufficient evidence to establish the identity of Forts as the' source of the threat to the school and probable cause to arrest him for violating §14. McCarthy, 385 Mass, at 163-64. That is all that is required to sustain an indictment. Id. See also Commonwealth v. Clarke, 44 Mass.App.Ct. 502, 509 (1998) (“[PJrobable cause requires considerably less evidence than that which is required to support a finding of guilty”). Forts’ indictment must therefore stand.
ORDER
For the foregoing reasons, Forts’ motion to dismiss the indictment is DENIED.

 Breivik’s manifesto is several hundred pages long. Several individual pages of this manifesto were posted on the bulletin boards of the school buildings in small packets of approximately three pages each. A three-page packet, the same excerpt of the manifesto, was slid under Professor Sholes’ office door.

 In this motion, Forts does not dispute that he is the individual who left the poem in the Founders Hall bathroom, in Professor Sholes’ office, and on school bulletin boards.

 The Supreme Judicial Court emphasized, in Kerns, that an indictment under c. 269, §14 does not require intended targets or any apprehension on the part of those targets. It contrasted the language of c. 269, §14 with that of the Massachusetts threat statute, G.L.c. 275, §2, which makes it a criminal offense to “threaten to commit a crime against the person or property of another.”
By legislative design, thus, conviction under G.L.c. 275, §2, requires proof that the threat was made in circumstances which, viewed objectively, could have caused the intended victim to fear that the defendant had both the intention and ability to carry out the threat. The language of G.L.c. 269, § 14(b), on the other hand, evinces a legislative intent that conviction require only that a threat was communicated to use, or have present, certain weapons, devices, or items at a place or location, whether or not the same is in fact used or present... Put simply, G.L.c. 275, §2, protects particular people and their possessions; G.L.c. 269, §14(b), protects places or locations and ultimately, the public.
449 Mass, at 654-55.

 In holding that the Commonwealth need not present evidence of fear or circumstances justifying apprehension, the court notes that it did consider the extent to which a defendant’s threats could reasonably place the recipient in fear that the defendant would carry out the threat in a similar case brought under the same statute and which the court decides together with the present action. In Commonwealth v. Grenga, WOCR2014-01337 (Mass.Super. November 6, 2015) (Kenton-Walker, J.), this court was required to address whether the defendant’s threats were made in circumstances that would justify fear on the part of the people who the defendant communicated his threat to. This is because, in motioning this court to dismiss an indictment brought under c. 269, §14, the defendant in Grenga argued that his supposed threats were protected under the First Amendment to the United States Constitution and Article 16 of the Massachusetts Declaration of Rights. This invocation of free speech rights triggered an obligation to analyze whether the circumstances supported the victim’s fear or apprehension because those constitutional provisions protect all expressive speech unless that speech is a “true threat,” a threat made “to place the target of the threat in fear. . .” Commonwealth v. Chou, 433 Mass. 229, 236 (2001) (emphasis added). This court determined that the defendant’s threats were made in circumstances justifying fear on the part of the recipients of the threat. Grenga, WOCR-2014-01337, slip-op. at 9-10. See generally Commonwealth v. Zapelli, 32 Mass. L. Rptr. 136 (Mass.Super. 2014) (dismissing an indictment brought under c. 269, §14 because *76 the indictment violated the defendant’s free speech nghts; the defendant’s statements were not intended to place the recipient in fear and" were not made in circumstances justifying apprehension on the part of the recipients).
Forts does not contend that his conduct was protected by the free speech provisions of the state or federal constitution, so the court will not consider the extent to which the recipients of the conduct were reasonably in fear of his threats. Here, absent any invocation of the First Amendment or Article 16, the court is left only with c. 269, §14, which simply does not require the Commonwealth to present any evidence of fear or apprehension.

 The Commonwealth cites to the fact that the poem was recited by McVeigh before his execution as contextual evidence that the poem alone constitutes a bomb threat. This is not knowledge that the officers and faculty who discovered the note on September 23, 2011 were privy to, so the poem alone could not be interpreted as a bomb threat.

 The manifesto also instructs readers about “using terror as a method for waking up the masses” and suggests that approximately 45,000 dead and one million wounded “Marxists/multi-culturalists in Western Europe” would be a proportional and proper human toll and asks that those who follow the reasoning of the manifesto commit these violent “operations.”

 In support of his motion to dismiss the indictment, Forts argues that no evidence was presented to the Grand Jury that faculty or officers read the manifesto at the time of the incident or were aware that it was written by Breivik. The court finds that Sergeant Brickman and Sergeant Richardson’s testimony that the excerpts from the manifesto that were found in Professor Sholes’ office matched some of the excerpts found on the bulletin boards was sufficient evidence for the Grand Jury members to rely on to determine that at least the school officers read and examined the manifesto at the time of the incident. It is irrelevant that officers were not aware of the manifesto’s relationship to Breivik. The Grand Jury has sufficient evidence to conclude that Forts was the individual who placed excerpts of the manifesto around the campus. The Grand Jury was entitled to conclude that Forts was adopting the material contained in the manifesto, irrespective of the manifesto’s author.
In contrast to Forts’ suggestion, it is similarly of no moment that Breivik’s manifesto advocates the overthrow of Marxism in Western Europe. The reasons for inflicting the violence advocated in the manifesto are irrelevant. Forts does not need to share the motivation of Breivik in order to be found to have adopted Breivik’s endorsement of mass violence to achieve certain ends.
Finally, the court recognizes that Forts’ statement to a Norwegian reporter extolling the virtues of Breivik bears no relevance to whether the manifesto constituted a threat and does not consider those statements in its analysis. Chapter 269, § 14 punishes the communication of the threat, irrespective of whether Forts intended for his conduct and statements to be a threat. See Kerns, 449 Mass, at 654; United States v. Fulmer, 108F.3d 1486, 1491 (1997) (“[T]he appropriate standard under which a defendant may be convicted for making a threat is whether he should have reasonably foreseen that the statement he uttered would be taken as a threat by those to whom it is made”). The court therefore does not consider Forts’ views on Breivik for the purposes of the defendant’s motion because those views were not communicated to the recipients of his threat at the school.